**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ERIKA POGORZELSKA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 19-cv-05683 |
| v. | ) | |
| | ) | Judge Marvin E. Aspen |
| VANDERCOOK COLLEGE OF MUSIC, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

MARVIN E. ASPEN, District Judge:

Plaintiff Erika Pogorzelska alleges that she was sexually assaulted by a classmate at an off-campus party prior to beginning her sophomore year at Defendant VanderCook College of Music ("VanderCook"). She asserts that VanderCook and its administrators were deliberately indifferent to her allegations of sexual assault and subsequent on-campus harassment and retaliated against her in violation of Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681.

VanderCook now moves for summary judgment on Plaintiff's Title IX claims. (VanderCook College of Music's Motion for Summary Judgment (Dkt. No. 112); Defendant's Memorandum in Support of Its Motion for Summary Judgment ("Def.'s Summ. J. Mem.") (Dkt. No. 120).)[1] It also moves to exclude the testimony of Kailey Hopkins, whom Plaintiff disclosed as an expert witness on the reasonableness of VanderCook's response to her allegations of sexual assault. (Defendant's Motion to Exclude Kailey Hopkins as an Expert Witness ("Def.'s Mot. to Exclude") (Dkt. No. 111).) Plaintiff opposes VanderCook's summary judgment motion and

---

[1] For ECF filings, we cite to the page number(s) set forth in the document's ECF header unless citing to a particular paragraph or other page designation is more appropriate.

moves to bar VanderCook's expert, Sandra Schuster, from testifying about Title IX industry standards and the reasonableness of VanderCook's response to the harassment allegations. (Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Summ. J. Opp'n") (Dkt. No. 133); Plaintiff's Motion to Bar Opinions Offered by Defendant VanderCook College of Music's Expert Witness (Dkt. No. 129); Plaintiff's Memorandum in Support of Her Motion to Bar Opinions Offered by Defendant VanderCook College of Music's Expert Witness ("Pl.'s Mem. to Exclude") (Dkt. No. 130).) For the following reasons, we deny Plaintiff's motion to exclude in part and grant it in part, deny VanderCook's motion to exclude in its entirety, and grant VanderCook's motion for summary judgment in part and deny it in part.

## FACTUAL BACKGROUND

We take the following facts from the parties' Local Rule 56.1 submissions,[2] the materials cited therein, and other aspects of the record in this case. All facts are genuinely undisputed unless otherwise noted.

VanderCook is a postsecondary music education school in Chicago, Illinois that receives federal funds within the meaning of 20 U.S.C. § 1681(a). (Pl.'s Resp. to Def.'s SOF ¶ 1.) The school has a population of approximately 100 students, and its campus consists of only two buildings that are leased from the nearby Illinois Institute of Technology ("IIT"). (*Id.* ¶¶ 1, 5.) VanderCook's 2017-2018 Annual Security and Fire Safety Report provides that its students are subject "to all VanderCook rules[,] regulations[,] and designated disciplinary procedures and sanctions for conduct that occurs on school premises, at a college activity, program, function or

---

[2] *See* Defendant's Local Rule 56.1 Statement of Material Facts ("Def.'s SOF") (Dkt. No. 115); Plaintiff's Response to Defendant's Local Rule 56.1 Statement of Material Facts ("Pl.'s Resp. to Def.'s SOF") (Dkt. No. 131); Plaintiff's Local Rule 56.1(b)(3) Statement of Additional Facts ("Pl.'s SOAF") (Dkt. No. 137); Defendant's Reply to Plaintiff's Local Rule 56.1(b)(3) Statement of Additional Material Facts ("Def.'s Reply to Pl.'s SOAF") (Dkt. No. 147).

sponsored event, in or near the off-campus residence of any VanderCook students[.]" (Def.'s Reply to Pl.'s SOAF ¶ 81 (quoting Dkt. No. 132-11, Ex. 66 at V824).)

In August 2017, when the events that gave rise to this lawsuit began, Plaintiff and Eric Ballenger were enrolled at VanderCook and both about to begin their sophomore years. (Pl.'s Resp. to Def.'s SOF ¶¶ 2, 14–16.) Plaintiff had first met Ballenger during the previous summer at a freshman orientation. (Id. ¶ 14.) Plaintiff and Ballenger were often in the same class, and they played in the same section of the school's orchestra. (Id. ¶ 15.)

On August 25, 2017, Ballenger hosted a surprise birthday party for one of his roommates at his apartment near campus. (Id. ¶ 16.) Plaintiff attended the party, drank alcohol, and consumed "dabs" (a concentrated form of marijuana). (Id. ¶ 17.) Ballenger was sober. (Id. ¶ 36; Def.'s Reply to Pl.'s SOAF ¶ 109.) At some point during the night, Plaintiff became intoxicated and lied down in Ballenger's room to rest. (Pl.'s Resp. to Def.'s SOF ¶ 17; Def.'s Resp. to Pl.'s SOAF ¶ 110.)

At her deposition, Plaintiff testified to the following: after falling asleep in Ballenger's room, she woke up in bed with Ballenger touching her underwear. (Pl.'s Resp. to Def.'s SOF ¶ 18.) Plaintiff confronted Ballenger and asked him to stop, which he did. (Id.) Later that night, Ballenger sexually penetrated her. (Id.) Again, Plaintiff told Ballenger to stop, and he did. (Id.) Plaintiff fell asleep in the bed and left the house the next morning. (Id.)

Two days after the party, Plaintiff went to the IIT Medical Center because she was experiencing symptoms of a urinary tract infection. (Id. ¶ 19.) After Plaintiff disclosed what had happened at the party, IIT contacted a therapist and sent Plaintiff to Rush Medical Center. (Id.) Rush ordered a rape kit and contacted the Chicago Police Department. (Id.) The Police Department prepared a report based on the information from Rush, but Plaintiff did not contact

the police herself or sign any complaint. (*Id.*) Nor did Plaintiff respond to law enforcement officers' attempts to contact her. (*Id.*)

On August 30, Plaintiff reported the alleged assault to Dr. I-Hsuan Tsai, VanderCook's Title IX Coordinator. (*Id.* ¶ 20.) Dr. Tsai emailed VanderCook's Dean of Undergraduate Studies, Professor Stacey Larson Dolan, and informed her of the allegations. (*Id.* ¶ 21.) Later that day, Dolan met with Dr. Tsai and then met one-on-one with Plaintiff. (*Id.* ¶¶ 21–22.) During her meeting with Dolan, Plaintiff explained what had happened at the party and provided a list of VanderCook students who attended the party and could serve as potential witnesses. (*Id.* ¶ 22.) Dolan took notes during the meeting.[3] (*Id.* ¶ 25.) Dolan also discussed the possibility of accommodations, such as switching classes, with Plaintiff. (*Id.*)

After her initial meeting with Plaintiff, Dolan began to investigate Plaintiff's allegations. (*Id.* ¶¶ 22–25.) That same day (August 30), Dolan emailed Ballenger and told him that she needed to speak with him as soon as possible. (*Id.* ¶ 26.) Later that afternoon, Ballenger met with Dolan and another VanderCook professor, David Eccles. (*Id.*) Ballenger told Dolan and Eccles his version of events. (*Id.* ¶¶ 26–27.) According to Ballenger, he went into his room to give Plaintiff a bottle of water, and she said she was okay. (*Id.* ¶ 27.) After telling Ballenger that she would stay the night, Ballenger lied down next to her. (*Id.*) Plaintiff was not wearing any paints. (*Id.*) Ballenger stated that Plaintiff began tickling him, and this eventually led to Plaintiff taking off her underwear and having intercourse with him. (*Id.*)

---

[3] VanderCook cites these notes as reflecting what was said during the meeting, but Plaintiff contends that certain characterizations were added after the fact since the Google Docs page on which the notes appeared was edited on September 13 and Dolan's testimony that she recorded her notes "a day or two later." (Dkt. No. 116-1, Ex. 2 ("Dolan Dep.") at 113:7–15; Pl.'s Resp. to Def.'s SOF ¶¶ 23–25.)

Before the meeting concluded, Dolan told Ballenger that he should have no interaction with Plaintiff moving forward and that the matter should not be discussed with anyone outside of the room.[4]  (*Id.* ¶ 28.)  Dolan then scheduled interviews with seven students whose names were provided by Plaintiff and Ballenger.  (*Id.* ¶ 29.)  On August 31, Dolan met with the students and interviewed them about what had happened at the party.  (*Id.* ¶ 30.)  On September 5, Dolan and Eccles met to review the evidence collected during the interviews.  (*Id.* ¶ 39.)

While the investigation was ongoing, and despite Dolan's instruction that Ballenger have no further contact with Plaintiff, Plaintiff was still seeing Ballenger at school.  (Def.'s Resp. to Pl.'s SOAF ¶ 96.)  On September 6, the day after Dolan and Eccles met to review the evidence, Plaintiff approached Dolan and expressed frustration with having to see Ballenger on campus.  (Pl.'s Resp. to Def.'s SOF ¶ 40.)  Dolan contacted VanderCook's CFO and Director of Financial Aid to formulate a plan so that Plaintiff would be advised of her options.  (*Id.* ¶ 41.)  After doing so, Dolan discussed the possibility of four different accommodations with Plaintiff: (1) continuing at school with some accommodations made to Ballenger's schedule, (2) taking a leave of absence, (3) withdrawing from all but two of her classes, or (4) withdrawing completely.  (*Id*).  Plaintiff did not immediately select which of these accommodations she would prefer, and no changes to her schedule were initially made.  (Def.'s Resp. to Pl.'s SOAF ¶¶ 97–99.)

That same day, September 6, Dolan sent an email to Stacy Layden at Rape Victims Advocates.  (Def.'s Resp. to Pl.'s SOAF ¶ 111.)  The email stated, among other things, that

---

[4] The parties refer to this oral instruction as a "no-contact order" throughout their briefing, but a written order reflecting the substances of this instruction was never created.  (Def.'s Resp. to Pl.'s SOAF ¶¶ 100–01.)  That said, we adopt the parties' convention of referring to Dolan's oral instruction as the "no-contact order" for purposes of this opinion.  The no-contact instruction was not communicated to Plaintiff's professors; the parties dispute whether this was because Plaintiff requested in her initial meeting with Dolan that her professors not be told.  (Def.'s Resp. to Pl.'s SOAF ¶ 102.)

"[o]ne of my students was sexually assaulted by another student at an off-campus party." (*Id.* ¶ 111 (quoting Dkt. No. 132-8, Ex. 59 at V621–V622).) Dolan wrote that she believed Plaintiff "100%" and but that there were "many grey areas due to [Plaintiff's] blacking out from drug use." (Dkt. No. 132-8, Ex. 59 at V621–V622.)

VanderCook's investigation concluded on September 12. (Pl.'s Resp. to Def.'s SOF ¶ 46.) Ballenger and Eccles' investigation notes indicate that there was not a preponderance of evidence supporting Plaintiff's allegations, they do not specifically articulate a basis for this finding. (*Id.*; Def.'s Resp. to Pl.'s SOAF ¶ 123.) Despite finding that there was not a preponderance of evidence against Ballenger, VanderCook concluded that the no-contact order should remain in place. (Pl.'s Resp. to Def.'s SOF ¶ 47.) Dolan and Eccles also decided to sanction Ballenger by requiring him to receive training for sexual misconduct, removing him from leadership positions, and warning him that if any reports of similar behavior occurred, he would be dismissed from the college. (*Id.* ¶ 48; Def.'s Resp. to Pl.'s SOAF ¶ 128.) A list of the sanctions that Ballenger was to receive—titled "Educational Sanctions" and "Disciplinary Probation"—appeared in a formal memo dated and signed by Ballenger on September 12. (Dkt. No. 132-2, Ex. 50 ("Disciplinary Memo") at V125.) The memo also recommended that Plaintiff and Ballenger engage in a mediated meeting to begin "the healing process." (*Id.*; Pl.'s Resp. to Def.'s SOF ¶ 48.)

On September 14, Dolan met with Plaintiff and Kailey Hopkins, a paralegal advocate at LifeSpan, a Chicago-based organization focused on domestic violence, to review a timeline summary of events and the results of the investigation. (Pl.'s Resp. to Def.'s SOF ¶ 50; Def.'s Resp. to Pl.'s SOAF ¶ 118.) During the meeting, Dolan directed Plaintiff to the policies and procedures in VanderCook's College Catalogue, which included a right to appeal. (Pl.'s Resp. to

Def.'s SOF ¶ 50.)  According to Plaintiff, Dolan also described the findings of the investigation as "guilty but not guilty," but Dolan disputes making such a statement.  (*See id.*; *compare* Dkt. No. 132-3, Ex. 51 ("Hopkins Dep.") at 38:8–15; 41:2–6; Dkt. No. 132-8, Ex. 60 at POGO_000611, *with* Dolan Dep. at 97:12–19.)  Plaintiff demanded that the recommendation of a mediated meeting between her and Ballenger be removed, and VanderCook acceded to the demand.  (*See* Pl.'s Resp. to Def.'s SOF ¶ 48; Dkt. No. 132-8, Ex. 59 at POGO_000611; Dkt. No. 116-1, Ex. 1 ("Pl.'s Dep.") at 145:5–17; Hopkins Dep. at 42:2–9, 43:16–18; Dkt. No. 132-7, Ex. 56 ("Joanne Pogorzelska Dep.") at 31:2–23; Dkt. No. 132-3, Ex. 52 ("Rosenthal Dep.") at 121:1–4.)  Plaintiff was not provided with the underlying investigation file during the meeting. (Def.'s Resp. to Pl.'s SOAF ¶ 112.)

On September 16, Dolan emailed Ballenger—with Eccles and Dr. Tsai copied—to inform him of the conclusion of the investigation and reiterate the terms of the no-contact order. (Pl.'s Resp. to Def.'s SOF ¶ 53.)  The email stated that "in light of Title IX mandates, a no-contact order remains in place between you and [Plaintiff].  You should not speak to her, nor remain in the same area as her whenever possible."  (Dkt. No. 116-4, Ex. 23.)  Plaintiff's professors were not informed of the instruction.  (Def.'s Resp. to Pl.'s SOAF ¶ 102.)

That same day, Plaintiff chose the first of the accommodations offered on September 6, *i.e.* she elected to remain at school with changes made to her schedule.  (Def.'s Resp. to Pl.'s SOAF ¶ 99.)  Plaintiff dropped or modified her enrollment in five classes.  (*Id.*)  Ballenger was only required to switch one of his class sections.  (*Id.*)  Following this modification, Plaintiff and Ballenger remained enrolled in a seminar class together.  (*Id.*)  On September 27, Plaintiff emailed Dolan, stating:

> I walk around school with my head down and have a couple of friends that help me avoid him.  Something as simple as seeing him

> makes my heart feel like it's been struck by lightning and I need to calm my body down even though my mind knows that I'm safe and in the present. With that being said, words can't even begin to explain how triggering it is to hear his voice. I actually heard someone talking with a similar accent to his and it instantly set me off... I am really proud of myself for making it through all of seminar with him there, but I can't have school be a constant test of strength – I'm already doing so just by being here and trying to get my life back on track, let alone having to hear his voice almost everyday (*sic*)....
>
> I just feel very alone sometimes with how the students and professors act like this never happened but it did and it's still fresh and it's still a very prominent issue in my life, heavily impacting my attending and getting caught up as quickly as I thought it would....

(Dkt. No. 132-12, Ex. 76 at V1107.)

At some point in late September or early October 2017, Plaintiff made a post on social media calling Dolan a "bitch." (Pl.'s Resp. to Def.'s SOF ¶ 55.) On October 3, 2017, Dolan met with Plaintiff to prepare an email that could be sent to Plaintiff's professors explaining why she was missing classes or arriving late. (*Id.* ¶ 54.) Plaintiff testified that, during their October 3 meeting, Dolan confronted her about the social media post and was visibly upset. (*Id.* ¶ 55; Def.'s Resp. to Pl.'s SOAF ¶ 147). According to Plaintiff, Dolan told her that "the assault didn't happen on campus," "it's not like the school assaulted [her]," and that Plaintiff did not "seem to be grateful or cooperative." (Pl.'s Resp. to Def.'s SOF ¶ 55 (quoting Pl.'s Dep. at 142:3–15).)

The following day, Plaintiff's mother sent Dolan an email reprimanding her for the harsh tone that she had allegedly taken with Plaintiff during the October 3 meeting. (Def.'s Resp. to Pl.'s SOAF ¶ 148.) Dolan responded to the email, concluding "[i]t is my hope that Erika and I do not need to have anymore (*sic*) one-on-one conversations regarding this situation. However, if asked, I will always work in the best interest of my students." (*Id.* (quoting Dkt. No. 132-12, Ex. 74 at V848).) Dolan then forwarded the email to Dr. Tsai and added that "I wish we could

all move on . . . it seems to have taken a portion of every day (some full days) since August 30th." (*Id.*) On October 5, Dolan met with Ballenger and told him that it was "necessary for you to make a more concentrated effort with the no-contact order." (Pl.'s Resp. to Def.'s SOF ¶ 57.)

According to Plaintiff, she was harassed on campus on at least three separate occasions after Dolan's October 5 meeting with Ballenger. First, Plaintiff's mother reported to Dolan on October 11 that Plaintiff had been verbally harassed by Ballenger's friends, including two students named Becca Calderon and Amanda Armstrong. (Pl.'s Resp. to Def.'s SOF ¶ 60; Def.'s Resp. to Pl.'s SOAF ¶ 133.) Dolan met with these students. (Pl.'s Resp. to Def.'s SOF ¶¶ 60–61.) After the meeting, Calderon posted a photo of herself and two others at Ballenger's apartment on her Instagram account. (Def.'s Resp. to Pl.'s SOAF ¶ 136.) In the photo, Calderon and the others are giving the middle finger to the camera with the caption "You better hide your kids, hide your wide (*sic*), hide your kids, hide your wife and hide your husband cus we r harassing everyone out there." (*Id.* (quoting Dkt. No. 132-11, Ex. 69 at POGO_680-81). The post was made on Calderon's private account, and VanderCook was not aware of it. (*See* Def.'s Resp. to Pl.'s SOAF ¶ 136.)

A second incident of harassment was reported on November 9, when Dolan received an email from Plaintiff's mother indicating that Ballenger had violated the no-contact order and Dolan's prior instruction to not attend an on-campus event where Plaintiff was scheduled to perform. (Pl.'s Resp. to Def.'s SOF ¶¶ 63, 65; Def.'s Resp. to Pl.'s SOAF ¶¶ 138–39.) During the performance, Ballenger appeared on Armstrong's cell phone via FaceTime while Plaintiff was sitting directly behind her. (Def.'s Resp. to Pl.'s SOAF ¶ 138.) Dolan responded to the email the next day, acknowledged that Ballenger's conduct was "not in the spirt of the no-contact order, and unacceptable" and stated that she would investigate Plaintiff's report when she

returned the following Monday. (*Id.* ¶ 139.) The parties dispute whether Ballenger was disciplined as a result of this incident (*see id.*), and the parties do not identify any evidence in the record indicating that Dolan spoke with Armstrong following this incident.

On December 1, after the FaceTime incident, Hopkins (the paralegal advocate from LifeSpan) called VanderCook's president, Dr. Roseanne Rosenthal. (Def.'s Resp. to Pl.'s SOAF ¶ 150.) Hopkins testified that when she voiced concerns regarding the no-contact order not being enforced, Dr. Rosenthal referred to Plaintiff as "being paranoid," said "that there was nothing more the school could do to help Plaintiff," and said "it's a small school . . . it's not like I can kick him out." (*Id.* ¶ 150 (quoting Dkt. No. 132-8, Ex. 60 (Life Span Notes) at POGO_610; Dkt. No. 132-3, Ex. 51 ("Hopkins Dep.") at 92:6–93:1.)

A third incident of harassment was reported on December 4, when Dolan received a formal written complaint from Plaintiff describing an additional violation of the no-contact order. (Def.'s Resp. to Pl.'s SOAF ¶ 142.) Plaintiff reported that during class on November 30, Ballenger sat just a couple rows in front of her, which forced her to switch chairs. (*Id.*) Plaintiff stated that "I have noticed the past couple of weeks that [Ballenger] has not been following the no contact order. . . . I've come close to running into him too many times and I feel like I'm back to trying to avoid him at all costs than he is me." (*Id.* (quoting Dkt. No. 116-6, Ex. 39 at APP 0203).) Ballenger was not disciplined or sanctioned for this incident. (*Id.* ¶ 143.)

Plaintiff estimates that, due to her fear of seeing Ballenger, she missed more than 20 classes, including several band rehearsals, as well as the pep band performance for the Chicago Marathon. (*Id.* ¶ 153.) She states that she suffered from anxiety, difficulty sleeping, stress, embarrassment, difficulties with normal life, and suicidal thoughts. (*Id.* ¶ 155.) At the end of the fall 2017 semester, Plaintiff withdrew from VanderCook and enrolled in the University of

Illinois. (*Id.* ¶ 156.) As a result of her withdrawal, Plaintiff was unable to graduate on time and had to stay in school for an additional three semesters. (Pl.'s Dep. at 28:21–22:3; 128:23–130:4.) She also lost financial aid and scholarships. (Def.'s Resp. to Pl.'s SOAF ¶ 156.)

## PROCEDURAL HISTORY

Plaintiff filed this suit on June 20, 2019, against VanderCook and Ballenger. (Dkt. No. 1.) Ballenger was later dismissed as a defendant pursuant to a settlement. (Dkt. No. 107.) Plaintiff served her Rule 26(a)(2) disclosures on January 3, 2022. (Dkt. No. 111-4.) These disclosures indicated that Kailey Hopkins, Plaintiff's LifeSpan advocate, would provide expert testimony and opinions under Rule 26(a)(2)(C) regarding the reasonableness of VanderCook's response to Plaintiff's report of sexual assault. (*Id.* at 1–2.) VanderCook deposed Hopkins as an expert witness on March 4, 2022. (Dkt. No. 111-3.)

VanderCook retained Sandra Schuster to testify as an expert on industry standards for Title IX compliance, investigations, and responses. (Schuster Dep. at 5:4–6.) In compliance with Rule 26(a)(2)(B), Schuster submitted a Confidential Expert Report, which was later amended. (*See id.* at 5:7–13; Dkt. No. 130-2 ("Schuster Expert Rep.").) Plaintiff deposed Schuster on May 9, 2022. (Schuster Dep. at 1:1–5:13.)

## ANALYSIS

There are three motions pending before us: (1) Plaintiff's motion to exclude; (2) VanderCook's motion to exclude, and (3) VanderCook's motion for summary judgment. We start by addressing the parties' motions to exclude, and then proceed to VanderCook's motion for summary judgment.

## I.      Motions to Exclude

### A.      Plaintiff's Motion to Exclude

First, we address Plaintiff's motion to exclude the expert opinion of VanderCook's Title

IX expert, Sandra Schuster.  Plaintiff seeks to exclude Schuster's testimony under Federal Rule

of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  (*See*

*generally* Pl.'s Mem. to Exclude.)  "Expert testimony is admissible when: (1) 'the expert's

scientific, technical, or other specialized knowledge will help the trier of fact to understand the

evidence or to determine a fact in issue'; (2) 'the testimony is based on sufficient facts or data';

(3) 'the testimony is the product of reliable principles and methods'; and (4) 'the expert has

reliably applied the principles and methods to the facts of the case.'"  *Downing v. Abbott*

*Laboratories*, 48 F.4th 793, 808–09 (7th Cir. 2022) (quoting Fed. R. Evid. 702), *reh'g denied*,

2022 WL 7291035 (7th Cir. Oct. 12, 2022), *cert. denied*, 143 S. Ct. 1012 (U.S. Mar. 6, 2023).

"[T]he district court acts as the gatekeeper for expert evidence, evaluating the proffered expert's

qualifications, the reliability of the expert's methodology, and the relevance of the expert's

testimony."  *Id.* at 809.  "The party seeking to introduce expert witness testimony has the burden

to show, by a preponderance of the evidence, that the testimony meets the *Daubert* standard."

*Id.*  Nonetheless, the standard for admitting expert testimony is liberal, and "rejection . . . is the

exception rather than the rule."  Fed. R. Evid. 702 advisory committee's note to 2000

amendment.

Plaintiff does not dispute that Schuster is qualified as an expert.  (Pl.'s Mem. to Exclude

at 5.)  We therefore do not consider the qualifications prong of the *Daubert* inquiry, nor do we

consider any other *Daubert*-related argument that Plaintiff does not raise.  *See United States v.*

*Jett*, 908 F.3d 252, 266 (7th Cir. 2018) ("District judges are not required to undertake each step

of the Rule 702 analysis when no party specifically requests it[.]").  Instead, Plaintiff argues that

(1) Schuster's opinion is not the proper subject of expert testimony (Pl.'s Mem. to Exclude at 5–7), (2) Schuster's opinion consists of improper legal conclusions (*id.* at 8–9), and (3) Schuster did not use a reliable methodology to form her opinion (*id.* at 9–12). Plaintiff also argues that Schuster's testimony will not assist the trier of fact and improperly opines on VanderCook's administrators' state of mind. (*Id.* at 12–15.) We address each of these arguments in turn.

### 1. Proper Subject of Expert Testimony

First, we reject Plaintiff's contention that Schuster's opinion is not the proper subject of expert testimony. Expert testimony is appropriate in circumstances where scientific, technical, or other specialized knowledge will assist the trier of fact. *Daubert*, 509 U.S. at 588–90. To prevail on a Title IX deliberate indifference claim based on peer-on-peer harassment, a plaintiff must demonstrate that (1) the school exercised substantial control over both the harasser and the context in which the known harassment occurred; (2) the plaintiff suffered harassment that is so severe, pervasive, and objectively offensive that it can be said to deprive them of access to the educational opportunities or benefits provided by the school; (3) the school had actual knowledge of the harassment; and (4) the school's response to the harassment was clearly unreasonable in light of known circumstances. *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 642–43 (1999).

Schuster's testimony is relevant to the fourth element of Plaintiff's deliberate indifference claim: whether the school's response to Plaintiff's harassment allegations was clearly unreasonable. Here, Schuster's testimony concerns the standards followed by schools in Title IX cases. The use of expert testimony in this context is commonplace, and numerous federal courts have recognized that "[e]xpert testimony regarding how schools effectively approach Title IX discrimination can be helpful to the jury." *Doe v. Coastal Carolina Univ.*, No. 4:18-CV-268-SAL, 2021 WL 1651057, at *3 (D.S.C. Mar. 8, 2021); *accord Muccie v. Dailey*, No. CV-20-66-

BU-BMM, 2022 WL 1746755, at *2 (D. Mont. May 31, 2022); *Roohbakhsh v. Bd. of Trs. of Neb. State Colls.*, No. 8:17CV31, 2019 WL 5653448, at *3 (D. Neb. Oct. 31, 2019); *Portz v. St. Cloud State Univ.*, 297 F. Supp. 3d 929, 953 (D. Minn. 2018); *Doe v. Wharton Indep. Sch. Dist.*, No. 2:16-CV-48, 2017 WL 932935, at *2 (S.D. Tex. Mar. 9, 2017). We agree with these courts that expert testimony on standards followed by schools in Title IX cases is permissible in evaluating whether a school's response to harassment is clearly unreasonable. We therefore reject Plaintiff's argument that Schuster's opinion is not the proper subject of expert testimony.

## 2. Improper Legal Conclusions

Next, we address Plaintiff's argument that Schuster's expert opinion consists of improper legal conclusions. (Pl.'s Mem. to Exclude at 8–9.) Expert witnesses may not testify to legal conclusions, which are the province of the court. *See United States v. Lupton*, 620 F.3d 790, 800 (7th Cir. 2010). Despite this prohibition, "courts and parties must recognize the difference between 'stating a legal conclusion' (which is not permitted) and 'providing concrete information against which to measure abstract legal concepts' (which is permitted)." *United States v. Neushwander*, No. 15 C 542-1, 2017 WL 45572212, at *3 (N.D. Ill. Oct. 14, 2017) (citing *United States v. Blount*, 502 F.3d 674, 680 (7th Cir. 2007)).

In the context of a Title IX case, testimony about industry standards or policies adopted by other institutions to comply with applicable regulations generally does not constitute a legal opinion or conclusion. *See, e.g.*, *Coastal Carolina Univ.*, 2021 WL 1651057, at *3; *Portz*, 297 F. Supp. 3d at 952; *Wharton Indep. Sch. Dist.*, 2017 WL 932935, at *2. At the same time, an expert generally cannot testify as to legal conclusions that will determine the outcome of the case, such as what Title IX requires or whether a party "has complied with those requirements." *See Portz*, 297 F. Supp. 3d at 953. Plaintiff's lead case on this argument, *Roohbakhsh* (in which Schuster was proffered as an expert by another Title IX defendant), expressly recognizes this distinction.

14

2019 WL 5653448, at *2.  There, the district court allowed Schuster to testify as an expert about "industry standards . . . as well as [] the history and purposes of Title IX," but prohibited her from offering an opinion on the ultimate issue of liability, *i.e.*, whether the school board's actions constituted deliberate indifference under Title IX.  *Id*. at *3–4.

After reviewing Schuster's expert report and comparing her testimony to those of experts in other Title IX cases in which expert testimony has been permitted, we find no fault with her opinions regarding the history and purpose of Title IX and her opinion that VanderCook complied with industry standards.  (*See* Schuster Report at 9–11.)  Unlike her testimony in *Roohbakhsh*, Schuster's expert opinion in this case does not embrace the ultimate issue of whether VanderCook was deliberately indifferent.  (*See, e.g.*, *id.* at 22–23.)  We deny Plaintiff's request to bar these aspects of Schuster's testimony as the product of improper legal conclusions.

Nonetheless, we find that certain statements contained in Section VI.b of Schuster's expert report are inconsistent with the proper role of an expert under Rule 702.  This section of Schuster's report purports to provide an overview of the "clearly unreasonable" standard as well as the significance of industry practices in evaluating whether this standard has been met.  Schuster makes several statements of law that reflect her own understanding of how the standard operates.  For example, Schuster states:

> The question is not whether the particular process employed by the school was the best possible process, or even whether it was a good process; nor is the question whether the school failed to follow its own procedures.  The question is whether school actions were "clearly unreasonable in light of the known circumstances," which can and should be assessed with respect to industry customs and standards.

(Schuster Rep. at 11.)  This statement and others like it are problematic, both because they provide an editorialized gloss on the operative standard without citing binding case law, and

because they infringe on the role of the court to instruct the jury on what the law is. *See Portz*, 297 F. Supp. 3d at 953. In *Portz*, the District of Minnesota excluded similar testimony on the grounds that allowing an expert to opine on the requirements of the law "would give the jury the appearance that the Court is shifting to [the expert] the responsibility to decide the case." *Id.* We therefore grant Plaintiff's motion to exclude Schuster's testimony solely with respect to Section VI.b of her expert report.

### 3. Methodology

We next address Plaintiff's contention that Schuster's testimony was based on an unreliable methodology. (Pl.'s Mem. to Exclude at 9–12.) Plaintiff argues that Schuster's opinion is not based on any principles other than her own experience. (*Id.* at 9–10.) She also contends that Schuster's opinion involves an improper methodology because she does not demonstrate that her opinion is consistent with those of other experts. (*Id.* at 11–12.)

Rule 702 and *Daubert* govern the reliability of an expert's testimony. *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 778 (7th Cir. 2017). "The non-exclusive list of *Daubert* reliability factors for scientific evidence includes whether or not the theory or technique has been (1) tested, (2) subjected to peer review and publication, (3) analyzed for known or potential error rate, and/or is (4) generally accepted within the specific scientific field." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 810 (7th Cir. 2012) (citing *Daubert*, 509 U.S. at 593–94, 113 S.Ct. 2786). But the "list of specific factors" set forth in *Daubert* "neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999) (internal quotation marks omitted).

An expert may render an opinion based on experience alone if the opinion has a reliable connection to the facts. *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010). "An expert's testimony is not unreliable simply because it is founded on his experience

rather than on data.'" *Id.* (emphasis in original); *accord Walker v. Soo Line R. Co.*, 208 F.3d 581, 591 (7th Cir. 2000). Admissible opinion testimony must "explain the methodologies and principles" that support the opinion rather than merely asserting a "bottom line." *Metavante*, 619 F.3d at 761. However, if the opinion is connected to the underlying information "only by the *ipse dixit* of the expert," it may be properly excluded. *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 809 (7th Cir. 2013) (citation omitted). Likewise, the testimony may not be based on "subjective belief or speculation." *Metavante*, 619 F.3d at 761 (citation omitted).

Schuster's method of opining on the reasonableness of VanderCook's response to Plaintiff's allegations based on her training and experience is a permissible methodology. *See id.* When addressing whether expert testimony based on experience is reliable, we do not consider the "factual underpinnings" of the testimony, but rather whether "[i]t was appropriate for [the expert] to rely . . . upon the sources of information which [she] employed." *Walker*, 208 F.3d at 586. VanderCook has presented evidence that Schuster has written hundreds of codes of conduct for colleges and universities, including ATIXA (Association of Title IX Administrators) Model, which is used by universities to comply with Title IX regulations. (*See* Dkt. 130-2.) Schuster has also authored several peer-reviewed papers on gender-based violence and Title IX, served as a consultant and as general counsel for universities, and represented fifty-three public colleges and universities as a Senior Assistant Attorney General for the State of Ohio. (*Id.*)

It is appropriate for Schuster to rely on her years of experience handling Title IX cases and investigations in opining on VanderCook's compliance with industry standards. Her inability to connect specific aspects of this extensive experience to her opinion in a deposition is not, without more, a basis for the wholesale exclusion of her testimony. Plaintiff is of course free to cross-examine Schuster to determine how she arrived at her conclusions. *See Daubert*,

509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.")  But we will not bar her from testifying on this basis.

Plaintiff also points to isolated statements in Schuster's deposition—such as the admission that there was nothing in her report to support her testimony about how schools "manifest" their response to Title IX reports—as a basis for exclusion.  (Pl.'s Mem. to Exclude at 11–12.)  But soundbites in a deposition taken out of context do not provide a basis for barring expert testimony.  *See, e.g.*, *Luxco, Inc. v. Jim Beam Brands Co.*, No. 14 C 0349, 2016 WL 4611385, at *6 (N.D. Ill. Sept. 6, 2016) (finding that "isolated statements" made during an expert's deposition testimony were not a sufficient basis to exclude the expert's testimony where the testimony was sufficiently detailed in other particulars); *see also Schmucker v. Johnson Controls, Inc.*, No. 3:14-CV-1593 JD, 2019 WL 718553, at *12 (N.D. Ind. Feb. 19, 2019) (declining to exclude testimony of defendant's expert based on a disputed factual statement in a 23-page report because "the factual underpinnings of the expert's analysis . . . are matters to be determined by the trier of fact, not grounds for exclusion under Rule 702").  We reject Plaintiff's motion to exclude Schuster's testimony on these grounds.

### 4.     Other Arguments for Exclusion

Plaintiff's other arguments for exclusion lack merit as well.  Her argument that Schuster's testimony will not assist the trier of fact essentially reiterates her arguments that Schuster's testimony is not the appropriate subject of expert testimony.  (*Compare* Pl.'s Mem. to Exclude at 7 ("Jurors do not need Schuster's help or any 'expert' to decide [] whether VanderCook's response to Plaintiff's report of sexual assault and ongoing harassment was 'clearly unreasonable under the known circumstances.'"), *with id.* at 14 ("Whether VanderCook's conduct was reasonable under the circumstances is a common sense and obvious observation that is not

beyond the ken of the average person.").).  Although the jury is the factfinder and will be tasked with evaluating whether VanderCook's conduct was clearly unreasonable, we reject the assertion that "[w]hether VanderCook's conduct was reasonable under the circumstances is a common sense and obvious observation that is not beyond the ken of the average person."  (*Id.* at 14.) The considerations involved in responding to allegations of sexual assault are various and complicated.  We do not believe that an average person could form a reliable conclusion as to whether an institution's response was clearly unreasonable as a matter of law without considering the administrative burdens and prevailing industry standards—the very information that Schuster's testimony provides.

Finally, we reject Plaintiff's argument that certain of Schuster's testimony constitutes impermissible state-of-mind testimony.  (*Id.* at 14–15.)  Whether VanderCook's response was "reasonable" and whether Plaintiff was "exceptionally well-accommodated and cared for by the College" are Schuster's own opinions about objective facts.  These opinions are in no way dependent upon the states of mind of VanderCook's administrators.  To the extent that these considerations involve a subjective component, Plaintiff will be entitled to cross-examine Schuster as to what she considered.  But this does not provide a basis for excluding Schuster's testimony entirely.  For the foregoing reasons, we grant Plaintiff's motion to exclude solely with respect to the information contain in Section VI.b of Schuster's expert report and deny Plaintiff's motion to exclude in all other respects.

### B.     VanderCook's Motion to Exclude

We next address VanderCook's motion to exclude the testimony of Plaintiff's expert witness, Kailey Hopkins.  VanderCook argues that Hopkins' testimony is inadmissible under Federal Rule of Evidence 702 and *Daubert*.  (Def.'s Mot. to Exclude at 4–5.)  VanderCook also

argues that Hopkins' testimony is inadmissible under Federal Rule of Evidence 403. (*Id.* at 11–12.)

### 1.    Federal Rule of Evidence 702 and *Daubert*

We first consider VanderCook's arguments pursuant to Rule 702 and *Daubert*. VanderCook argues that Hopkins is not qualified to opine on the reasonableness of universities' responses to Title IX investigations by virtue of her training and experience. (*See generally* Def.'s Mot. to Exclude.)  It further contends that Hopkins' methodology is flawed due to her bias and the fact that she obtained most of the information she relies on directly from Plaintiff and her mother. (*Id.*)

Hopkins did not submit an expert report in this lawsuit, and Plaintiff disclosed her as a hybrid fact/expert witness. (*See* Dkt. No. 111-4 at 2; Plaintiff's Response in Opposition to Motion to Exclude (Plaintiff's Response in Opposition to Defendant's Motion to Exclude ("Pl.'s Opp'n to Def.'s Mot. to Exclude") (Dkt. No. 128) at 1.)  "Hybrid fact/expert witnesses" with experience in a particular industry are permitted to "testify from the personal knowledge they gained on the job." *Ind. Airport Auth. v. Travelers*, 849 F.3d 355, 371 (7th Cir. 2017).  These witnesses are not required to produce full-fledged expert reports and need only disclose the subject matter of their testimony and a summary of the facts and opinions to which they are expected to testify.  *See* Fed. R. Civ. P.  26(a)(2)(C).  However, hybrid witnesses "do not have carte blanche to testify about topics outside of their personal knowledge." *Ind. Airport Auth.*, 849 F.3d at 371.  Nor are they permitted to offer opinions based on "information learned solely through . . . litigation." *Id.*

Plaintiff's Rule 26(a)(2) disclosures indicate that Hopkins is an expert with respect to whether "VanderCook deviated from the practices similar educational institutions would follow in similar circumstances arising out of the occurrences alleged in the Amended Complaint."

20

(Dkt. No. 111-4 at 2.)  For the purposes of VanderCook's motion, we therefore consider whether Hopkins' training and experience qualifies her to opine on customs and practice of educational institutions in response to Title IX investigations.

*a)*     *Qualifications*

We first address whether Hopkins is qualified to testify as an expert.  An expert can be qualified "by knowledge, skill, experience, training or education."  Fed. R. Evid. 702.  This is a "liberal standard; the expert need only have some 'specialized knowledge that would assist the trier of fact.'"  *Prayitno v. Nextep Funding LLC*, No. 17 C 4310, 2019 WL 6497374, at *3 (N.D. Ill. Dec. 3, 2019) (quoting *Wilson v. City of Chicago*, 6 F.3d 1233, 1238 (7th Cir. 1993)); *see also Daubert*, 509 U.S. at 588 (observing the "liberal thrust" of the Federal Rules and their "general approach of relaxing the traditional barriers to 'opinion' testimony").  A district court should consider "a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area."  *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000).

Hopkins worked for approximately three years at LifeSpan Legal Services and Advocacy, an organization dedicated to addressing sexual assault and domestic violence.  (Dkt. No. 128-4 at 47:6–18; Dkt. No. 128-6.)  In this capacity, Hopkins assisted 216 clients in domestic violence related incidents.  (Dkt. No. 128-3 at 20:5–11.)  Approximately 30 of these clients were involved in Title IX investigations, including investigations related to incidents at Northwestern University, the University of Chicago, Columbia College, and North Park University.  (*Id.* at 113:24–114:17; Dkt. No. 128-4 at 18:8–19.)  Additionally, she trained approximately 300 individuals—including Title IX Coordinators—on sexual assault, domestic violence, stalking, and intimate partner violence.  (Dkt. No. 111-2.)

Despite this experience, VanderCook argues that that Hopkins is insufficiently qualified to opine on the reasonableness of a university's response to Title IX allegations. (Def.'s Mot. to Exclude at 5–7.) It emphasizes that Hopkins' experience is limited to educational institutions in Cook County and that her training reflects a "smorgasbord" of voluntary training rather than a formalized course of study. (*Id.* at 6.) VanderCook also highlights an admission that Hopkins made in her deposition that she was not "an expert in all things Title IX." (*Id.* at 5–6.)

We reject VanderCook's argument and find that Hopkins is qualified to testify as an expert based on her background in conducting Title IX trainings and participating in Title IX investigations. Hopkins' testimony indicates that she participated in approximately 30 investigations at five postsecondary schools in the Chicago area during her three-year tenure at LifeSpan. (Dkt. No. 128-3 at 20:5–11, 113:24–114: 17; Dkt. No. 128-4 at 18:8–19.) And although Hopkins did not participate in a formal course of study, this is not necessary for an individual to qualify as an expert. *Smith*, 215 F.3d at 718.

VanderCook emphasizes the fact that Hopkins' title is a "paralegal advocate" and that she had only worked at the LifeSpan organization for a year-and-a-half before becoming involved in this case. (Def.'s Mot. to Exclude at 2.) But it does not cite any case law suggesting that these facts make Hopkins unqualified. (*See id.*) Indeed, a witness need only have more specialized knowledge than a judge or a lay jury to qualify as an expert. *United States v. Williams*, 81 F.3d 1434, 1441 (7th Cir. 1996) ("All you need to be an expert witness is a body of specialized knowledge that can be helpful to the jury."). Nor is Hopkins' admission that she is not an expert "in all things Title IX" fatal. (Mot. to Exclude at 5 (quoting Hopkins Dep. at 134:14–19).) Hopkins is not purporting to give testimony on "all things Title IX." (*See* Dkt. 111-4.) Moreover, "it is the trial judge, and not the witness . . . who has the responsibility and discretion

to determine whether a witness is qualified as an expert." *Lolie v. Ohio Brass Co.*, 502 F.2d 741, 746–47 (7th Cir. 1974) (finding that a mine inspector was qualified as an expert witness even though the inspector "may [not] have thought that he was or should be an expert."). Subsequent testimony makes clear that Hopkins' statement was meant to indicate that her expertise was limited to out-of-court investigations, as opposed to litigation. (Hopkins Dep. at 135:4–8 ("I would say I have a lot of experience reviewing the reports and being an advocate in the investigation but I am not accustom (*sic*) to litigation, legal findings, the federal court process, what you are doing.").)

VanderCook is, of course, free to highlight any perceived deficiencies in Hopkins' experience through cross-examination. But, in this case, the perceived deficiencies are not so significant that Hopkins cannot testify in the first place. *See Traharne v. Wayne/Scott Fetzer Co.*, 156 F. Supp. 2d 697, 706 (N.D. Ill. 2001) ("Once a witness passes the threshold of knowledge, skill, experience, training, or education to qualify as an expert, any shortcomings or deficiencies which he or she possesses are reserved for cross-examination.").

VanderCook also argues that Hopkins' experience participating in Title IX investigations with other universities is not relevant because the other schools that Hopkins worked with "are much bigger than VanderCook," and her experience in Cook County, Illinois "does not amount to adequate knowledge about the national standards" involved in a Title IX case. (Def.'s Mot. to Exclude at 6.) These factors might be relevant to the question of liability, *see Gabrielle M. v. Park Forest-Chicago Heights, Ill. Sch. Dist. 163*, 315 F.3d 817, 825 (7th Cir. 2003) (discussing the relevance of administrative burdens to the deliberate indifference inquiry), but VanderCook cites no case law indicating how or why these factors are relevant to assessing an expert's

qualifications. (*See generally* Def.'s Mot. to Exclude.) We decline to exclude Hopkins'
testimony on this basis.

*Doe v. Colgate University*, 760 F. App'x 22 (2d Cir. 2019), cited by VanderCook, does
not compel a contrary result. (Def.'s Mot. to Exclude at 7.) In *Colgate*, a non-precedential
opinion, the Second Circuit affirmed the district court's conclusion in a Title IX case that the
plaintiff's proffered witness, a law professor who had authored several law review articles on the
"serial rapist trope," was not qualified to opine on the procedural deficiencies in the defendant
university's response under Title IX. 760 F. App'x at 28. Despite the witness's illustrious
academic credentials, the district court concluded that she was unqualified as an expert because
she had "never attended a Title IX training, served on a Title IX panel, conducted a Title IX
investigation, or interviewed a Title IX coordinator, investigator, or decision-maker." *Doe v.
Colgate Univ.*, No. 5:15-CV-1069 (LEK/DEP), 2017 WL 4990629, at *8 (N.D.N.Y. Oct. 31,
2017). By contrast, Hopkins was trained in Title IX response and conducted Title IX
investigations while at LifeSpan. (*See, e.g.*, Dkt. No. 111-2.) And unlike the expert witness in
*Colgate*, Hopkins' experience extends to interviewing key decisionmakers, like Dolan
(VanderCook's Dean of Undergraduate Studies) and Dr. Rosenthal (VanderCook's President).

VanderCook also contends that Hopkins' credentials are not as extensive as those of its
own Title IX expert, Sandra Schuster. (*See* Defendant's Reply in Support of Motion to Exclude
(Dkt. No. 148) at 4 (highlighting the "extreme gap" in experience between Hopkins and
Schuster).) But in assessing whether an individual is qualified as an expert, "[t]he question is not
whether [the proffered expert] witness is more qualified than other experts in the field; . . .
[r]ather, the issue is whether the witness is more competent to draw the inference than the lay
jurors and judge." *Prayitno*, 2019 WL 6497374, at *3 (quotation marks omitted).) Here,

Hopkins' training and experience in conducting Title IX investigations at LifeSpan renders her more qualified than a generalist court or lay jurors to opine on the reasonableness of VanderCook's conduct. Moreover, our conclusion that Hopkins is qualified as an expert does not preclude VanderCook from emphasizing any perceived gaps in her experience during cross-examination. *See Traharne*, 156 F. Supp. 2d at 706. We therefore find that Hopkins is qualified as an expert on the reasonableness of schools' Title IX responses and reject VanderCook's argument to exclude Hopkins' testimony based on her lack of qualifications.

### b)    *Methodology*

Next, VanderCook argues that Hopkins' anticipated expert testimony is inadmissible because it lacks the "sufficiency and reliability." (Def.'s Mot. to Exclude at 7–11.) As stated above, an expert is permitted to offer opinions based on their training and experience so long as that experience has a reliable connection to the facts. *Metavante Corp.*, 619 F.3d at 761. Hopkins bases her opinions about the reasonableness of VanderCook's practices on her observations made during Title IX investigations at other colleges and universities in Cook County. (*See* Pl.'s Resp. to Def.'s Mot. to Exclude at 11–12 (identifying Hopkins methodology as "using first-hand knowledge of the facts regarding her interactions with Plaintiff and VanderCook and comparing it to her training and experiences with other schools in similar circumstances").) Hopkins' resume and deposition testimony indicate that she has participated in Title IX investigations at other institutions, and she was also party to meetings and conversations with VanderCook administrators. Her opinion regarding the reasonableness of VanderCook's conduct is drawn from this experience and thus cannot be characterized as mere *ipse dixit*. *Metavante*, 619 F.3d at 761.    Based on the foregoing, we find that Hopkins' method

of comparing VanderCook's practices to those of other universities based on her experience is a permissible methodology. *See id.*

VanderCook argues that Hopkins' methods are unreliable for a few additional reasons, which we address in turn. First, VanderCook argues that Hopkins is biased due to her involvement in the case as Plaintiff's advocate. (Def.'s Mot. to Exclude at 7–8; *see also id.* at 7 ("Ms. Hopkins never played the part of an objective observer of any kind.").) "An expert's alleged bias, however, is not a proper basis on which to exclude his or her testimony under *Daubert* or Rule 702." *NeuroGrafix v. Brainlab, Inc.*, No. 12 C 6075, 2020 WL 3643057, at *5 (N.D. Ill. July 6, 2020) (citing *Cage v. City of Chicago*, 979 F. Supp. 2d 787, 827 (N.D. Ill. 2013)). Indeed, every expert in litigation is in some sense biased, insofar as they are incentivized to "bend" their opinion to favor the position of the party for whom they are testifying. *See Indianapolis Colts, Inc. v. Metro. Baltimore Football Club Ltd. P'ship.*, 34 F.3d 410, 415 (7th Cir. 1994).

VanderCook cites a couple of out-of-circuit cases for the proposition that bias may be grounds for disqualifying an expert witness entirely. (Def.'s Mot. to Exclude at 8.) But these cases involved "a clear conflict of interest or bias of an extraordinary degree," such as an undisclosed attorney-client or familial relationship between the expert and the plaintiff. *See El Ansari v. Graham*, No. 17-CV-3963 (VEC), 2019 WL 3526714, at *8 (S.D.N.Y. Aug. 2, 2019) (collecting cases). Moreover, these cases emphasize that "the threshold for disqualifying an expert on this basis is high because many expert witnesses have some level of discernible bias or appearance of bias." *Id.* Any bias Hopkins harbors as a result of her role as an advocate for victims of domestic violence simply does not rise to the level necessary to exclude her testimony.

Next, VanderCook attacks the factual basis of Hopkins' testimony, asserting that it was largely filtered through interviews with Plaintiff and her mother, and that this renders her methodology unreliable. (Def.'s Mot. to Exclude at 8–9.) But the fact that Hopkins' knowledge of the facts was obtained via interviews is not, without more, a basis for exclusion. Under Rule 703, an expert "may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Fed. R. Evid. 703. Interviews with parties are a permissible factual basis for expert testimony under this standard. *United States v. Brownlee*, 744 F.3d 479, 481–82 (7th Cir. 2014). Moreover, Hopkins' opinion is also based on statements that Dolan and Rosenthal made to Hopkins during their respective interviews. (*See generally* Dkt. No. 132-8 (Hopkins' notes).) These statements were not "filtered" through any intermediary and provide additional factual foundation for Hopkins' testimony.

Finally, VanderCook argues that Hopkins has insufficient knowledge of the facts by pointing to several inconsistencies in her testimony. (Def.'s Mot. to Exclude at 9–10.) But an "expert's reliance on faulty information is a matter to be explored on cross-examination; it does not go to admissibility." *Manpower, Inc.*, 732 F.3d at 809 (citations omitted); *see also Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765 (7th Cir. 2013) ("The jury must still be allowed to play its essential role as the arbiter of the weight and credibility of expert testimony."). The purported inconsistencies in Hopkins' testimony, while certainly relevant to her credibility, are not a proper basis for the wholesale exclusion of her testimony. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (explaining that credibility determinations are for the jury); *Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1068 (7th Cir. 2013) ("It is for the jury to evaluate the 'soundness' of the facts and data underlying the opinion."); *Ernst v. City of Chicago*, 39 F. Supp. 3d 1005, 1014 (N.D. Ill. 2014).

In conclusion, we find that Plaintiff has met her burden of demonstrating that Hopkins is qualified to testify, based on her training and experience, that VanderCook deviated from the practices similar educational institutions would follow in similar circumstances. We also find that Hopkins' method of drawing inferences from her training and experience is a reliable methodology. We therefore reject VanderCook's attempt to exclude Hopkins' testimony under *Daubert* and Rule 702.

### 2. Federal Rule of Evidence 403

VanderCook also argues that we should exclude Hopkins' testimony pursuant to Federal Rule of Evidence 403. (Def.'s Mot. to Exclude at 11.) Rule 403 allows a court to exclude relevant evidence only if its probative value is "substantially outweighed" by unfair prejudice, confusion of the issues, or its potential to mislead a jury. Fed. R. Evid. 403. This is "a highly discretionary assessment." *Lange v. City of Oconto*, 28 F.4th 825, 845 (7th Cir. 2022) (citation omitted). Because "most relevant evidence is, by its very nature, prejudicial," evidence must be *unfairly* prejudicial to require exclusion. *United States v. Hanna*, 630 F.3d 505, 511 (7th Cir. 2010). Only evidence that "will induce the jury to decide the case on an improper basis rather than on the evidence presented" will satisfy this standard. *United States v. Boswell*, 772 F.3d 469, 476 (7th Cir. 2014).

On one side of the scale, there is probative value in Hopkins' anticipated testimony regarding the practices of other universities in conducting Title IX investigations. We cannot agree with VanderCook's assertion that Hopkins' "minimal qualifications and one-sided investigation carry *no* probative value." (Def.'s Mot. to Exclude at 11 (emphasis added)); *see Coles v. City of Chicago*, No. 02 C 9246, 2005 WL 1785326, at *3 (N.D. Ill. July 22, 2005) ("[L]imited probative value is not the same as no probative value."). By knowing how other

universities conduct Title IX investigations, the jury can better determine whether the investigation that VanderCook conducted was unreasonable. Nor can we conclude that any of Hopkins' testimony is unfairly prejudicial or likely to confuse the jury. As stated above, a jury is perfectly capable of ascertaining the limitations of Hopkins' training and experience, as well as recognizing any inconsistencies in her testimony. And we are confident in the ability of VanderCook's counsel to cross-examine Hopkins and draw the jury's attention to the issues that it identifies in its motion. We decline to exclude Hopkins' testimony under Rule 403, and we therefore deny VanderCook's motion to exclude on this basis as well.

\*       \*       \*

In conclusion, we grant Plaintiff's motion to exclude in part and deny it in part, and deny Defendant's motion to exclude in its entirety. Although neither Schuster nor Hopkins will be precluded from testifying entirely, the parties remain free to raise appropriate objections to specific aspects of their testimony at trial.

## II.     VanderCook's Motion for Summary Judgment

We now turn to VanderCook's motion for summary judgment on Plaintiff's Title IX claims. Summary judgment is appropriate "where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." *Giles v. Godinez*, 914 F.3d 1040, 1048 (7th Cir. 2019). "We consider all of the evidence in the record in the light most favorable to the non-moving party, and we draw all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 457 (7th Cir. 2020) (citation omitted). "On summary judgment we do not weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021). "We have one task and one task only: to decide, based on the evidence

29

of record, whether there is any material dispute of fact that requires a trial." *Id.* (quotation marks omitted).

### A.    Plaintiff's Deliberate Indifference Claim

We first address Plaintiff's deliberate indifference claim.  Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  Under Title IX, a school may be held liable for the sexual harassment of one of its students "when the harasser is a student" and the school is deliberately indifferent to this harassment.  *Davis*, 526 U.S. at 643.

As stated above, to prevail on a Title IX deliberate indifference claim based on peer-on-peer harassment, a plaintiff must demonstrate that (1) the school exercised substantial control over both the harasser and the context in which the known harassment occurred; (2) the plaintiff suffered harassment that is so severe, pervasive, and objectively offensive that it can be said to deprive them of access to the educational opportunities or benefits provided by the school; (3) the school had actual knowledge of the harassment; and (4) the school's response to the harassment was clearly unreasonable in light of known circumstances.  *Id.* at 642–43; *accord Doe v. Galster*, 768 F.3d 611, 617 (7th Cir. 2014); *Gabrielle M.*, 315 F.3d at 821.  This is a "high bar."  *Galster*, 768 F.3d at 617.

Plaintiff argues that VanderCook was deliberately indifferent in responding to both the off-campus sexual assault and the subsequent on-campus harassment.  We analyze VanderCook's response to each of these incidents, beginning with the former.

### 1.      VanderCook's Response to the Off-Campus Sexual Assault

We first consider VanderCook's response to Plaintiff's allegation that Ballenger sexually assaulted her.  The parties do not dispute that the alleged sexual assault constitutes severe gender-based sexual harassment for the purposes of Title IX, or that VanderCook had actual knowledge of the alleged harassment after Plaintiff reported the incident to Tsai on August 30, 2017.  (*See generally* Def.'s Summ. J. Mem.; Pl.'s Summ. J. Opp'n.)  We therefore consider only whether a reasonable jury could find that (1) VanderCook exercised substantial control over Ballenger and the context of the harassment and (2) VanderCook's response to Plaintiff's allegations was clearly unreasonable.

First, we find that there is sufficient evidence for a jury to conclude that VanderCook exercised substantial control over Ballenger and the context in which the alleged harassment occurred such that it had a duty to address the harassment.  *Davis*, 526 U.S. at 642–44.  A school may be liable for peer-on-peer harassment in circumstances where "the harasser is under the school's disciplinary authority."  *Id.* at 646–47 (emphasis added).  VanderCook's own policy handbook recognizes that its regulations and disciplinary procedures extend to "the off-campus residence of any VanderCook students."  (Def.'s Reply to Pl.'s SOAF ¶ 81 (quoting Dkt. No. 132-11 at V824).)  Moreover, after receiving a report of the sexual assault, VanderCook's administrators began investigative and disciplinary procedures, and never took the position that the school was not required to do so under Title IX prior to this litigation.  (*See generally* Pl.'s Resp. to Def.'s SOF; Def.'s Resp. to Pl.'s SOAF.)  These facts are sufficient to create a question

for a jury as to whether VanderCook exercised control over the alleged off-campus assault such that it had an obligation to respond.

Relying on the Ninth Circuit's decision in *Brown v. Arizona*, 23 F.4th 1173, 1180 (9th Cir. 2022), VanderCook argues that the fact that the assault occurred off campus means that it cannot be liable for deliberate indifference, full stop. (Def.'s Summ. J. Mem. at 12–13.) VanderCook's reliance on *Brown* is improper for two reasons. First, the decision has been vacated. *See Brown v. Arizona*, 56 F.4th 1169 (9th Cir. 2022). Second, *Brown* involved allegations that a school's failure to *prevent* an off-campus sexual assault constituted deliberate indifference. (Def.'s Summ. J. Mem. at 12 (citing *Brown*).) That is not the argument Plaintiff is making here. Instead, she contends that VanderCook's *response* to the off-campus sexual assault was clearly unreasonable. (Pl.'s Summ. J. Opp'n at 17.) VanderCook has not demonstrated that, as a matter of law, it had no duty to investigate a complaint of off-campus sexual assault involving two enrolled students where the school's own disciplinary policies extend to off-campus residences.

Next, we consider whether a reasonable jury could conclude that VanderCook's response to Plaintiff's allegation was "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648. The Supreme Court has explained that this is "not a mere 'reasonableness' standard" and that there is "no reason why courts, on a motion to dismiss, for summary judgment, or for a directed verdict, could not identify a response as not "clearly unreasonable" as a matter of law. *Id.* at 649. Moreover, "[a] negligent response is not unreasonable, and therefore will not subject a school to liability." *Johnson v. Ne. Sch. Corp.*, 972 F.3d 905, 911 (7th Cir. 2020) (quoting *Karasek v. Regents of Univ. of Cal.*, 956 F.3d 1093, 1105 (9th Cir. 2020)). A court may not "second guess a school's disciplinary decisions—even a school's decision not to

32

impose any disciplinary measures—so long as those decisions are not clearly unreasonable." *Id.* at 912.

We find that there is a disputed issue of material fact precluding summary judgment on Plaintiff's deliberate indifference claim: whether VanderCook and its administrators privately concluded (despite their written finding to the contrary) that Ballenger was guilty of sexually misconduct.

On September 6, 2017, after interviewing all of the students who had attended the off-campus party, Dolan sent Sarah Layden at Rape Victims Advocates an email stating that "[o]ne of [her] students was sexually assaulted by another student at an off-campus party," and stating that she "believe[d] [Plaintiff] '100%." Dkt. No. 138-8 at V621–622.) According to Hopkins, Dolan told her during a September 14 interview that Ballenger was "guilty but not guilty." (Hopkins Dep. at 38:8–15; 41:2–6.) This phrase also appeared in Hopkins' contemporaneous notes from the meeting. (Dkt. No. 132-8, Ex. 60 at POGO_000611.) After the investigation, VanderCook imposed "Educational Sanctions" and "Disciplinary Probation" on Ballenger, including sexual assault counseling, and "walk[ing] him through the definition of consent." (Def.'s Resp. to Pl.'s SOAF ¶¶ 128–32; Disciplinary Memo; Dkt. No. 116-4, Ex. 22 at APP 0177.) Dolan testified that she had doubts that Ballenger understood the definition of consent. (Dolan Dep. at 171:16–19.) When asked why the sanctions were imposed, Eccles testified that "the evidence did say that something happened … obviously something did occur … there was some type of sexual contact between Eric and Erika, and Erika was not, you know—was not comfortable at some point with the encounter." (Dkt. No. 132-2, Ex. 49 at 34:20–35:12.)

On VanderCook's motion for summary judgment, we are bound to interpret these facts in the light most favorable to Plaintiff. *Donald*, 982 F.3d at 457. Based on these facts—that

Ballenger was sanctioned for sexual misconduct, that Dolan told Plaintiff and Hopkins that Ballenger was "guilty but not guilty," and that Dolan stated in an email that Plaintiff "was sexually assaulted" and that she "believe[d] [Plaintiff] 100%"—a reasonable jury could conclude VanderCook and its administrators determined that Ballenger had committed sexual misconduct (*i.e.*, he was "guilty") but decided to find him "not guilty" in an effort to return to the *status quo* that existed before the allegations were made. This inference is strengthened by other evidence suggesting that, following the conclusion of the investigation, VanderCook administrators wished to "move on" and "begin the healing process" rather than impose further disciplinary consequences on Ballenger. (Dkt. 132-12, Ex. 73 at V1118; Dkt. No. 116-2, Ex. 16, at APP 0145.)

A jury could find that such a response is "clearly unreasonable" under *Davis* and its progeny. Indeed, Sandra Schuster, VanderCook's expert on the reasonableness of the college's Title IX response, testified that if the school had concluded that Ballenger was "guilty but not guilty," this would fall below industry standards because the college had an obligation to determine whether the assault had happened or not. (Dkt. No. 132-12, Ex. 72 ("Schuster Dep.") at 124:18–7.) Finding Ballenger "guilty but not guilty" of sexual assault would go beyond mere negligence because it would make Plaintiff vulnerable to harassment in the form of future encounters with the person who assaulted her. *See Davis*, 526 U.S. at 643 (describing deliberate indifference as conduct that "causes students to undergo harassment or makes them liable or vulnerable to it").

VanderCook asserts that the "guilty but not guilty" statement was never made, and that it appears nowhere in the official findings of the investigation. (*See* Defendant's Reply in Support of Motion for Summary Judgment ("Def.'s Summ. J. Reply") (Dkt. No. 151) at 10–12.) But

Hopkins' testimony as to what Dolan said to her during the September 14 interview is admissible non-hearsay. *See* Fed. R. Evid. 801(d)(2). VanderCook argues that we should not credit Hopkins' statement because of purported inconsistencies in her testimony. (Def.'s Summ. J. Reply at 10–11.) But "summary judgment cannot be used to resolve swearing contests between litigants." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). It is for the jury to assess Hopkins' credibility. Because a reasonable jury could conclude that VanderCook had control over the circumstances of Plaintiff's off-campus sexual assault, that the assault constituted harassment of which VanderCook had knowledge, and that VanderCook's response to the assault was deliberately indifferent, we deny VanderCook's motion for summary judgment on Plaintiff's deliberate indifference claim as it relates to VanderCook's alleged failure to respond to Plaintiff's off-campus sexual assault.

### 2. VanderCook's Response to On-Campus Harassment

Next, we consider VanderCook's response to incidents of on-campus harassment following the conclusion of the investigation. Although Dolan met with Ballenger on October 5, 2017, and told him that it was "necessary for you to make a more concentrated effort with the no-contact order," Plaintiff argues that Ballenger and his friends harassed Plaintiff at least three times thereafter. First, on October 11, Ballenger's friends made unspecified remarks to Plaintiff at school, and Ballenger's friends also harassed Plaintiff on social media. (Def.'s Resp. to Pl.'s SOAF ¶¶ 133, 134, 136.) Second, on November 9, Ballenger appeared on Amanda Armstrong's FaceTime while Plaintiff was sitting directly behind her, despite a previous instruction from Dolan not to attend the performance. (Pl.'s Resp. to Def.'s SOF ¶ 65.) Finally, on November 30, Ballenger sat near Plaintiff in class, forcing her to change seats. (Def.'s Resp. to Pl.'s SOAF ¶¶ 139–42; Pl.'s Resp. to Def.'s SOF ¶¶ 63, 65, 68.) We consider whether each of these

incidents constituted severe, gender-based harassment to which VanderCook was obligated to respond, and, if so, whether VanderCook's response was clearly unreasonable.

Defendant first contends that the unspecified comments made by Ballenger's friends do not rise to the level of severe, gender-based harassment. (Def.'s Summ. J. Mem. at 13–14.) We agree. There is no evidence in the record of what was said, or whether the comments related to Plaintiff's allegations of sexual assault. Even if the comments were severe enough to constitute harassment, in order to be actionable, they also must be gender-based. *See, e.g.*, *Burwell v. Pekin Cmty. High Sch. Dist. 303*, 213 F. Supp. 2d 917, 930 (C.D. Ill. 2002) ("In order to be actionable, the offensive behavior must be based on sex, rather than personal animus or other reasons."). Without testimony indicating what was said, there is no basis to infer that the statements implicated Plaintiff's gender. Plaintiff cites cases in which verbal threats and name-calling following a reported sexual assault were found to constitute harassment. (Pl.'s Summ. J. Opp'n at 23–24.) But in these cases, the plaintiffs presented evidence of what was said. *See Doe v. E. Haven Bd. of Educ.*, 200 F. App'x 46, 48 (2d. Cir. 2006) (plaintiff presented evidence that classmates called her "[a] slut, a liar, a bitch, a whore"); *Cavalier v. Cath. Univ. of Am.*, 306 F. Supp. 3d 9, 33 (D.D.C. 2018) (plaintiff presented evidence that her alleged assaulter's friends called her a "slut" and a "whore"). Because there is no evidence upon which to conclude that the comments made by Ballenger's friends were severe or gender-based, we grant Defendant's motion with respect to this verbal harassment.

We also agree with Defendant that Calderon's Instagram post is not actionable under Title IX. (Def.'s Summ. J. Mem. at 14.) Knowledge of gender-based harassment is a prerequisite to a finding of deliberate indifference, and "[s]chool administrators have actual knowledge only of the incidents that they witness or that have been reported to them. *Galster*,

768 F.3d at 618. Plaintiff has presented no evidence that VanderCook was aware of Calderon's Instagram post prior to the initiation of this action. Indeed, Calderon testified that she made the post on a private account. (Dkt. 116-1, Ex. 5 ("Calderon Dep.") at 98:6-99:15.) Because Plaintiff has failed to present evidence that VanderCook had knowledge of the Instagram post, we grant VanderCook's motion with respect to this harassment.

Next, we consider the two reported violations of the no-contact order on November 9 and November 30. We find that the facts, when viewed in the light most favorable to the Plaintiff, and in the context of Plaintiff's allegations of sexual assault, provide a basis for a jury to conclude that Plaintiff experienced severe, gender-based harassment that deprived her of educational opportunities. Regardless of whether the sexual assault occurred off campus, "a reasonable jury could conclude that further encounters, of any sort, between a rape victim and her attacker could create an environment sufficiently hostile to deprive the victim of access to educational opportunities provided by a university." *Kelly v. Yale Univ.*, No. CIV.A. 3:01-CV-1591, 2003 WL 1563424, at *3 (D. Conn. Mar. 26, 2003); *accord Doe v. Derby*, 451 F. Supp. 2d 438, 444–45 (D. Conn. 2006).

Plaintiff has presented evidence indicating that she was forced to encounter Ballenger on campus following the school's internal determination that he was guilty of sexual misconduct. The facts of *Kelly v. Yale University* and *Doe v. Derby* are instructive. In both *Kelly* and *Derby*, the plaintiff argued that on-campus encounters with a harasser after an off-campus sexual assault constituted severe and pervasive gender-based harassment under *Davis*. *Kelly*, 2003 WL 1563424 at *3; *Derby*, 451 F. Supp. 2d. at 444–45. In each case, the district court concluded that there was a triable issue as to whether the plaintiff had experienced severe, pervasive, and objectively offensive sexual harassment because a jury could find that the harasser's "presence

37

on campus and the accompanying risk [the plaintiff] might encounter him" created a hostile

environment that effectively deprived the student of educational opportunities. *Kelly*, 2003 WL

1563424 at *3; *Derby*, 451 F. Supp. 2d. at 444.  In *Derby*, the district court also found that the

severity of the harassment was strengthened by the small size of the school, which increased the

likelihood of further encounters.  *Derby*, 451 F. Supp. 2d at 444–45.  As in *Derby*, the relatively

small size of VanderCook's student population and campus (100 students attending classes in

two buildings) forced Plaintiff into close proximity with her alleged attacker and increased the

possibility of further harassment.  *Id.* at 444.

     In response, VanderCook cites no caselaw for the proposition that contact between a

sexual assault victim and her alleged assaulter is not gender-based harassment.  (*See generally*

Def.'s Summ. J. Mem.)  Instead, it argues that the conduct was not sufficiently severe to be

actionable.  (*Id.* at 16.)  But in the context of Title IX harassment, "matters of degree—such as

severity and pervasiveness—are often best left to the jury."  *Doe v. Sch. Dist. No. 1*, 970 F.3d

1300, 1311–12 (10th Cir. 2020).   Moreover, the cases that VanderCook relies on did not involve

allegations that a no-contact order had been violated.  (Def.'s Summ. J. Mem. at 17.)  In *Ha v.*

*Northwestern University*, No. 14 C 895, 2014 WL 5893292, at *2 (N.D. Ill. Nov. 13, 2014), for

example, the complaint did not allege that the plaintiff's assaulter had violated a no-contact order

or even encountered the plaintiff on campus after she reported the sexual assault.  *Id.*  The

harassment that the plaintiff complained of was the mere fact that her harasser was still

employed by the university and that she suffered from "knowledge of [his] presence."  *Id.*

     Similarly, in *Thomas v. Meharry Medical College*, 1 F. Supp. 3d 816, 826–27 (M.D.

Tenn. 2014), the plaintiff failed to allege any further contact with his harasser after a no-contact

order had been imposed.  And in *Frazer v. Temple University*, 25 F. Supp. 3d 598, 615–16 (E.D.

38

Pa. 2014), there were no allegations that any sort of nonconsensual sexual contact had occurred between the plaintiff and her alleged harasser before their on-campus encounter. These cases present a very different factual situation from one in which a plaintiff is forced into close contact with her harasser after the school's administration had imposed a no-contact order and allegedly concluded that he was guilty of sexual misconduct. We decline to find that, as a matter of law, on-campus encounters between a victim of sexual assault and the perpetrator after a no contact order has been imposed do not constitute severe harassment.

VanderCook also argues that, because Dolan and Eccles did not find that Plaintiff's allegation against Ballenger was substantiated by a preponderance of the evidence, Plaintiff is relying on her "subjective perception of the incidents of harassment" to support her claim. (Def.'s Summ. J. Mem. at 16 (citing *Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 167 (5th Cir. 2011)).) But although Dolan and Eccles' notes state there was not a preponderance of evidence against Ballenger, this framing did not appear in the formal memo sanctioning Ballenger, and the administrators were not able to consistently articulate the basis for their finding. (*See* Def.'s Resp. to Pl.'s SOAF ¶ 123.) Moreover, Plaintiff has presented additional evidence, including the "guilty but not guilty" statement and the formal memo sanctioning Ballenger, indicating that VanderCook concluded Ballenger *was* guilty. On VanderCook's motion for summary judgment, we are bound to draw all factual inferences in Plaintiff's favor. *Donald*, 982 F.3d at 457. The question of whether VanderCook believed that the sexual assault had occurred is a factual dispute for the jury to determine, and we decline to grant summary judgment on the basis that Plaintiff's perception of sexual assault was subjective. In sum, we find that there is a question for the jury as to whether Plaintiff's encounters with

Ballenger on campus following the conclusion of VanderCook's investigation and the imposition of the no-contact order constitute severe, gender-based harassment under Title IX.

Having determined that there is a triable issue of fact with respect to whether Plaintiff experienced harassment, we next consider whether VanderCook's response to this harassment was clearly unreasonable. Plaintiff has put forth evidence indicating that VanderCook did not take adequate steps to enforce the no-contact order against Ballenger. (Def.'s Resp. to Pl.'s SOAF ¶¶ 96, 99.) Indeed, VanderCook was aware as early as September 6—only one week after the initial report was filed and before the investigation had concluded—that the no-contact order was not preventing Plaintiff and Ballenger from encountering one another on campus. (Pl.'s Resp. to Def.'s SOF ¶ 40.) Dolan admitted that she never informed Plaintiff's professors about the no-contact order. (Dolan Dep. at 220:1.) And Ballenger violated the order at least two more times after Dolan emailed him on October 5 and expressly stated that he needed to make a "greater effort" to abide by it. (*See* Def.'s Resp. to Pl.'s SOAF ¶¶ 133–43.) Although VanderCook claims that Dolan met with Ballenger after each reported violation, there is no indication that he received any consequences following these violations other than a talking-to.

A jury could conclude that, once it became apparent that the no-contact order was not working, VanderCook's failure to take additional steps was clearly unreasonable based on its knowledge that the response was ineffective to remedy the harassment. *See Delgado v. Stegall*, 367 F.3d 668, 671 (7th Cir. 2004) ("Deliberate indifference means shutting one's eyes to a risk one knows about but would prefer to ignore."); *see also Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 671 (2d Cir. 2012) (holding that the jury's finding of deliberate indifference was supported by the record based in part on the fact that the school's "remedial actions were little more than half-hearted measures"); *Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 262

(6th Cir. 2000) ("Where a school district has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail, such district has failed to act reasonably in light of the known circumstances."); *Seiwert v. Spencer Owen Cmty. Sch. Corp.*, 497 F. Supp. 2d 942, 954 (S.D. Ind. 2007) (finding that a question of fact precluded summary judgment on deliberate indifference element where principal responded to report of bullying by telling the victim "don't take all threats seriously" and only moved the victim to another classroom).

VanderCook appeals to its small size to justify its response to Plaintiff's reports of harassment, implying that a different response would have been untenable under the circumstances. (*See* Def.'s Summ. J. Mem. at 21; Def.'s Summ. J. Reply at 22; *see also* Schuster Expert Rep. at 18–19 (emphasizing the "unique nature of contact between students at a College of that small size, with only two buildings"); Dkt. No. 132-8 at POGO_000610 (indicating that VanderCook's President Roseanne Rosenthal told Hopkins "it's a small school . . . it's not like I can kick [Ballenger] out.").) True, the size of a school is a factor that may contribute to the administrative burdens of a Title IX response and, by extension, whether its response to harassment is clearly unreasonable. *See Gabrielle M.*, 315 F.3d at 825. But the fact that VanderCook is a small school cuts both ways. The school's size made it much more likely that Ballenger would violate the no-contact order, as he ultimately did.

Although *Davis* does not entitle a plaintiff to specific remedial measures, it is possible for a reasonable jury to find that VanderCook's failure to adequately enforce the remedial measures that it implemented—as well as its apparent failure to entertain any additional measures once it became apparent that the no-contact order was ineffective—constitutes deliberate indifference. *See Delgado*, 367 F.3d at 671.

VanderCook cites *Johnson v. Northeastern School Corp.* to support its argument that its failure to enforce the no-contact order against Ballenger did not amount to deliberate indifference. (Def.'s Summ. J. Mem. at 18–19.) In *Johnson*, the Seventh Circuit upheld summary judgment in a school district's favor on deliberate indifference claims. 972 F.3d at 918. A no-contact order had been imposed in response to allegations that plaintiff had been sexually assaulted by another student off campus. *Id.* at 913–14. The plaintiff presented evidence that her harasser violated the order by passing her in the school hallways and sitting near her at a basketball game. *Id.* 914–15. The Seventh Circuit affirmed the finding that the school district's response to the harassment was not clearly unreasonable because it investigated each reported incident, even though it declined to take additional disciplinary measures like suspension or expulsion. *Id.*

Although *Johnson* also involved an off-campus sexual assault and allegations that a no-contact order had been violated, its similarities to the present case end there. Significantly, the school administration in *Johnson* had not conducted their own investigation at the time the no-contact order was violated and instead deferred to a pending investigation by law enforcement officials. *Id.* at 912–14. The alleged violations of the no-contact order took place before the investigation concluded and before the school authorities had an opportunity to interview the parties involved. *Id.* at 913. Unlike the present case, there were no facts in the record suggesting that the no-contact order was violated after administrators had determined that the perpetrator was "guilty" of sexual misconduct. We cannot find that VanderCook's alleged failure to enforce the no-contact order was not clearly unreasonable as a matter of law when there is a factual dispute as to whether the school administrators privately determined that Ballenger was guilty of sexual assault.

In sum, when viewed in the light most favorable to Plaintiff, a reasonable jury could find that the fact that the school failed to enforce its own no-contact order after it was informed of multiple violations, and after it had concluded that Ballenger was "guilty" of sexual assault, was clearly unreasonable. For the foregoing reasons, we deny VanderCook's motion for summary judgment with respect to Plaintiff's Title IX deliberate indifference claim.

**B.     Plaintiff's Retaliation Claim**

Finally, we address Plaintiff's retaliation claim. Title IX prohibits retaliatory acts or attempts to retaliate against anyone who has reported in good faith sexual misconduct or discrimination. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005). To establish a claim for retaliation under Title IX, Plaintiff must demonstrate that (1) she engaged in a statutorily protected activity; (2) the school took a materially adverse action against her; and (3) there existed a but-for causal connection between the protected activity and the retaliation. *See Burton v. Bd. of Regents of Univ. of Wis. Sys.*, 851 F.3d 690, 695 (7th Cir. 2017) (citing *Milligan v. Bd. of Trs.*, 686 F.3d 378, 388 (7th Cir. 2012) and *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 337, 360 (2013)).

We grant summary judgment for VanderCook on Plaintiff's retaliation claim. First, Plaintiff has not put forth sufficient evidence that VanderCook took a "materially adverse action" against her. The Supreme Court has described a materially adverse action as one so adverse that "it might well have dissuaded a reasonable [person] from making or supporting charge of discrimination." *Burlington N. & Santa Fe. Ry. v. White*, 548 U.S. 53, 68 (2006); *see also Yap v. Nw. Univ.*, 119 F. Supp. 3d 841, 851 (N.D. Ill. 2015) (quoting *Burlington* and noting that the material adversity standard is the same for Title VII and Title IX claims). The only adverse actions that Plaintiff identifies in response to VanderCook's motion for summary judgment are

43

VanderCook's alleged inaction in response to her reports of harassment and Dolan's allegedly

disparaging statements toward Plaintiff. (*See* Pl.'s Summ. J. Opp'n.) Neither of these actions,

however, are sufficient to support her retaliation claim.

First, Plaintiff has not presented evidence indicating that VanderCook failed to take

action in response to her reports of harassment. To the contrary, the record indicates that

VanderCook responded, and did so promptly. After being notified of the alleged sexual assault

on August 30, 2017, Dr. Tsai, VanderCook's Title IX coordinator, referred the case to Dolan,

who—along with Eccles—immediately began investigating the facts. (Pl.'s Resp. to Def.'s SOF

¶¶ 21–23.) Dolan met with Plaintiff and Ballenger that same day and immediately imposed a no-

contact order. (*Id.* ¶¶ 22–28.) While the investigation was pending, the administrators discussed

the possibility of changing Plaintiff's schedule. (*Id.* ¶¶ 28, 41.) Within days of the initial report,

Dolan met multiple times with Plaintiff and interviewed students who were at the party. (*Id.*

¶ 30.) A week after the incident was reported, Dolan communicated with the CFO and Director

of Financial Aid to advise Plaintiff of her options. (*Id.* ¶¶ 41–43.) The administrators reviewed

the evidence, and made findings within two weeks of initial report, which they shared with

Plaintiff and Hopkins. (*Id.* ¶¶ 46–50.) After the investigation concluded, Dolan responded to

each of Plaintiff's reports of harassment by meeting with Ballenger and his friends. (*See

generally id.*)

In short, there is no evidence that VanderCook failed to respond to Plaintiff's allegations

entirely. As VanderCook points out, the circumstances in which other courts have found

inaction to be materially adverse are very different from the circumstances here. (Def.'s Summ.

J. Reply at 27–28.) For example, *Doe v. University of Tennessee*, 186 F. Supp. 3d 788, 800,

810–11 (M.D. Tenn. 2016), cited by Plaintiff, involved a university's failure to take action to

avoid a prospect of imminent harm to the plaintiff. Here, there is no evidence indicating that Plaintiff faced imminent harm after she reported the sexual assault, or that VanderCook failed to respond to any such possibility of harm.

Nor do VanderCook's other actions rise to the level of materially adversity. Plaintiff also points to the "guilty but not guilty" statement, hostile statements allegedly made to Plaintiff during her meeting with Dolan, and the school's inconsistent reasons for sanctioning Ballenger. (Pl.'s Summ. J. Opp'n at 35–36.) But "[n]either a bruised ego, nor a lone instance of public humiliation constitutes actionable retaliatory conduct." *Burton v. Bd. of Regents of the Univ. of Wis. Sys.*, 171 F. Supp. 3d 830, 842 (W.D. Wis. 2016), *aff'd*, 851 F.3d 690 (7th Cir. 2017). Likewise, giving inconsistent reasons for a sanction is not an adverse action, and Plaintiff cites no authority to the contrary.

More fundamentally, even if the evidence is sufficient to demonstrate that VanderCook took a materially adverse action against Plaintiff, it is insufficient to show that a protected action (Plaintiff's report of harassment) *caused* this adverse response. "Retaliation is, by definition, an intentional act." *Jackson*, 544 U.S. at 173. To demonstrate causation Plaintiff simply points to Dolan's alleged statements and VanderCook's shifting reasons for sanctioning Ballenger. (Pl.'s Summ. J. Opp'n at 35–36.) There is no evidence from which to conclude that the statements were made *because* Plaintiff filed her Title IX complaint or reported harassment. We cannot infer a causal connection based on "mere speculation or conjecture." *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010); *McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003). Because there is no evidence of causation between Plaintiff's reporting the sexual assault and VanderCook's allegedly retaliatory conduct, we grant VanderCook's motion for summary judgment with respect to Plaintiff's Title IX retaliation claim.

**CONCLUSION**

For the foregoing reasons, VanderCook's motion to exclude (Dkt. No. 111) is denied in its entirety; VanderCook's motion for summary judgment (Dkt. No. 112) is granted in part and denied in part; and Plaintiff's motion to exclude (Dkt. No. 129) is granted in part and denied in part. Because this case will proceed on VanderCook's deliberate indifference claim, the parties shall comply with Local Rule 16.1's instructions regarding the final pretrial order and submit a proposed final pretrial order in the form set forth by Local Rule 16.1. *See* Form LR 16.1.4, Final Pretrial Order Form, available at https://www.ilnd.uscourts.gov/_assets/_documents/_rules/LR16%20Final%20Pretrial%20Order%20Form.pdf. The parties shall submit this proposed order by August 17, 2023. It is so ordered.

Marvin E. Aspen
United States District Judge

Dated: June 5, 2023